UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

GARY EDWARD WILLIAMSON,          )
                                 )
        Plaintiff,               )
                                 )          Civil Case No.
v.                               )          5:12-CV-334-JMH-REW
                                 )
UNITED STATES OF AMERICA,        )     **MEMORANDUM OPINION AND ORDER**
                                 )
        Defendant.               )

***

I.

Plaintiff Gary Edward Williamson filed this action under the Federal Tort Claims Act, ("FTCA") 28 U.S.C. § 1346(b), 2671 *et seq.* against the United States, asserting claims of medical malpractice arising out of Williamson's medical treatment at the Veteran's Administration Medical Center ("VAMC") in Lexington, Kentucky.  Williamson alleges that he suffered a fracture of his right navicular bone that was improperly diagnosed and treated despite multiple visits to the VAMC.  Specifically, Williamson claims that VAMC employees failed to diagnose the fracture on four separate occasions between October 26 and December 8, 2009, although the fracture was visible on x-ray and MRI imaging. Williamson claims that Syed Ahmed, D.P.M., correctly diagnosed the fracture in January 2010, but failed to initiate a clinically acceptable course of treatment.  When Williamson's foot did not heal with conservative treatment, Dr. Ahmed performed two

surgeries, both of which, Williamson claims, violated the accepted standard of care.   In the summer of 2010, Williamson sought an outside opinion from Stephen Lawrence, M.D., an orthopedic surgeon specializing in the foot and ankle.   Dr. Lawrence performed two additional surgeries, resulting in a fusion of Williamson's right talonavicular joint.   Williamson claims that, had it not been for the Defendants' failure to diagnose and treat his fracture within the accepted standard of care, the fracture would have healed uneventfully.

After completion of discovery and a ruling granting partial summary judgment to Plaintiff with respect to damages, [DE 75], a bench trial commenced on September 2, 2015, and concluded on September 4, 2015.   Following the bench trial, the parties submitted post-trial briefs. [DE 109, 112, 113]. Having considered the testimony of various witnesses, the exhibits admitted into evidence on behalf of both parties, the arguments of counsel, and the remainder of the record, the Court finds as follows, pursuant to Federal Rule of Civil Procedure 52:[1]

## II.   FINDINGS OF FACT

Williamson is a retired United States postal carrier and a military veteran.   He joined the United States Army in 1989, serving as an airborne soldier.   He was honorably discharged from

---

[1] To the extent that any findings of fact constitute conclusions of law, they are adopted as such.   To the extent that any conclusions of law constitute findings of fact, they are so adopted.

active duty in 1993, and transferred to the National Guard, where he remained enlisted until 1998. That year, he left the Guard to attend college, earning a Bachelor's degree in criminal justice. He began working for the U.S. Postal Service as a city mail carrier in 2006. He was considered "part-time flexible" throughout his tenure, which meant that he did not have a fixed assigned route, but he averaged 55 hours per week and walked up to eight miles per day. From 2006 to 2009, he also worked for the Lexington Herald-Leader, delivering newspapers in the mornings before his mail route. Despite developing serious, chronic pain in his right foot in September 2009, and quitting his newspaper-delivery job because of it, Williamson reenlisted in the National Guard because he "wanted to finish [his] military career." He testified that his goal upon reenlistment was to go to Officer Candidate School and become a Commissioned Officer. He continued to deliver mail until December 2009 but, around that time, became unable to do so and began drawing workers' compensation under the Federal Employees' Compensation Act ("FECA"). Williamson was approved for disability retirement by the Office of Personnel Management on July 18, 2013.

On October 26, 2009, Williamson presented to the Veteran's Administration Emergency Department ("ED") complaining of right foot and ankle pain. X-rays were taken and the ED physician diagnosed Williamson with a sprain. He was advised to rest, elevate, and ice his foot, and NSAIDs were prescribed. Williamson

returned to the ED on November 27, 2009, again complaining of right ankle pain.  During this visit, he reported that while delivering mail, he had stepped in a hole and twisted his ankle.  X-rays were ordered, which the radiologist read as showing no boney trauma or acute fracture.  Based on the x-ray and his clinical findings, Travis Sewalls, M.D., constructed a splint to protect Williamson's ankle and instructed him to rest his foot and apply ice and compression.  Dr. Sewalls testified that he instructed Williamson to avoid bearing weight on his right ankle, but Williamson disputes this.  While any instruction for Williamson to avoid bearing weight was absent from Sewalls' treatment note, Sewalls did indicate that Williamson should avoid bearing weight in a Department of Labor form.  Sewalls arranged for Williamson to follow up with the orthopedic department in December.

On December 4, 2009, Williamson underwent an MRI of his right foot and ankle and, on December 8, reported for a follow-up appointment at the VA orthopedic clinic.  Neither the radiologist nor the treating orthopedist diagnosed Williamson with a fracture at that time.  Rather, the orthopedist diagnosed Williamson with an ankle sprain and advised him to bear weight on his right foot as tolerated.  On December 23, 2009, Williamson telephoned Sharon Chandler, A.R.N.P., his primary care provider at the VA, telling her that he was still having significant problems with his right foot and that he felt he had been "blown off" by the orthopedic

4

department.  He requested a referral to a podiatrist and, after an office visit with Chandler, Chandler referred him to the VA podiatric clinic.

On January 20, 2010, Williamson saw Syed Ahmed, D.P.M., who diagnosed a fracture of the navicular bone based on the x-rays and MRI.  Dr. Ahmed and Williamson decided to try conservative treatment, which featured a CAM walker—a removable boot used to offload pressure from a patient's foot, while allowing the patient to place some amount of weight on the extremity.  Ahmed also administered a steroid injection to the right heel and planned to order a bone stimulator.  Ahmed's notes reflect that, when Williamson returned on February 11, he reported that his midfoot pain was fifty percent better.

On February 27, 2010, Williamson left Kentucky to attend National Guard training at Fort Bragg, North Carolina.  Dr. Ahmed's treatment notes made no mention of the military training prior to Williamson's departure.  Ahmed testified that he did not recall discussing this with Williamson, and that he would have discouraged Williamson from participating in any type of physical training at that time.  On March 1, 2010, while still in Fort Bragg, Williamson reported to Womack Army Medical Center with right foot pain, stating that he had "reaggravated" his ankle during a land navigation exercise.  X-rays were performed, which revealed approximately three millimeters of separation between the

navicular bone fragments.  Williamson concluded his training at Fort Bragg on March 14 and returned for a follow-up appointment with Dr. Ahmed on March 17, 2010.  At that point, Williamson reported that the pain was much worse and acknowledged that he had been out of his CAM walker.  Noting the separation that was visible on the most recent x-ray, Williamson and Ahmed agreed that Ahmed would perform an open reduction internal fixation ("ORIF") to repair the navicular fracture.

Dr. Ahmed performed the procedure on April 6, 2010, using a dorsal medial approach to access the fracture.  At the time of surgery, he believed he had achieved "good compression," but quickly realized that the fracture was not fixated.  Williamson and Dr. Ahmed chose to go forward with a revision of the procedure. On April 21, 2010, Dr. Ahmed performed a second ORIF, using a fully threaded screw to attempt fixation of the navicular bone.  Dr. Ahmed testified that he was satisfied with the outcome of this surgery and that he instructed Williamson to remain non-weight bearing for six to eight weeks.  Based on his history and the likelihood of arthritis progressing, Ahmed believed that Williamson would need a joint fusion at some point in the future.

Following the April 21 surgery, there were some signs that Williamson was not progressing normally.  Between his May 6 and May 20 follow-up appointments with Dr. Ahmed, he visited the ED for additional pain medicine.  Additionally, he came back to see

6

Dr. Ahmed for a follow-up appointment after two weeks, rather than the three Ahmed had suggested. On July 12, 2010, Dr. Ahmed reported that Williamson "states foot feels good and only has pain when he is doing a lot of activities on it. He attempted to do a weekend of reserve training and was not able to tolerate more than 15 to 20 minutes of activity at one time." Around this time Williamson attempted the running portion of a physical fitness test for the National Guard and failed. Dr. Ahmed determined that Williamson should have modified activities at work and during reserve training, with a gradual return to full activities, which could take six to eight months. On July 13, Dr. Ahmed wrote an addendum indicating that REVA x-rays showed signs of healing. He noted that there was no need for further revision at that time and that Williamson should continue to use a bone stimulator, which could aid in further healing. On July 14, Ahmed wrote another addendum, however, which was quite different in tone. It stated that he had spoken with Williamson regarding his x-rays and that the two had a detailed discussion regarding treatment options. Ahmed noted that Williamson had not been using the bone stimulator as directed. He told Williamson that he may need a talonavicular fusion, but recommended getting a second opinion. At trial, Dr. Ahmed explained his change in opinion between July 13 and July 14 by stating that on July 13, he had not yet reviewed Williamson's

most recent x-ray films, which apparently showed that the navicular was not healing.

Throughout the summer of 2010, Williamson made frequent trips to the emergency room due to foot pain. Eventually, he decided to contact Jerold Friesen, M.D., an orthopedist who had repaired his ACL several years earlier. Dr. Friesen evaluated Williamson on August 3, 2010, and ordered diagnostic imaging, including a CT scan. Friesen referred Williamson to Stephen Lawrence, M.D., an orthopedic surgeon and specialist of the foot and ankle at the University of Kentucky. Dr. Lawrence evaluated Williamson on August 16, 2010, diagnosing him with nonunion of the navicular bone and arthritic changes of the talonavicular joint. Lawrence felt that Williamson had a very difficult and complex problem, and recommended surgery to fixate the nonunion, including a bone graft from the tibia, and a fusion of the talonavicular joint because of Williamson's arthritis. Dr. Lawrence noted that the navicular bone was a complete nonunion and, since it had been about four months since the last surgery, it was very unlikely to heal on its own. Dr. Lawrence performed surgery on August 25, 2010. Williamson wore a cast and was instructed to remain non-weight bearing for at least six weeks. He followed up regularly with Dr. Lawrence and in October 2010, Lawrence thought Williamson was doing "exceptionally well." By January 2011, he had begun bearing full weight on his right foot. Dr. Lawrence felt it unlikely that

Williamson would ever be able to return to his duties as a mail carrier, however, because the fusion would almost surely lead to problems with prolonged walking.  Around this time, Williamson made another attempt to run as part of a physical fitness test for the National Guard, which he failed.  Based on Williamson's right foot and ankle problems, Dr. Lawrence assigned him a six percent whole body impairment rating, using the fifth edition of the American Medical Association's guide to the evaluation of impairment.  Though the fracture had healed and Williamson had reached maximum medical improvement, Dr. Lawrence believed that the foot would never be normal.

On September 1, 2012, Williamson's National Guard unit was deployed to the Republic of Djibouti in the Horn of Africa.  He was on a permanent physical profile at the time, which restricted him to low impact activity and no running.  Williamson testified that his tasks during deployment were security-based, such as driving a Humvee, and that he did not walk for his job.  He only took ten to fifteen minute walks from his housing unit to the chow hall and to his work compound.  Williamson testified that his right foot pain was tolerable for the most part, but that the pain increased toward the end of his deployment.  Williamson returned to Lexington and followed up with Dr. Lawrence on September 23, 2013.  Upon examining Williamson's foot, Dr. Lawrence noted that a piece of bone on the lateral side of the foot had become

prominent, meaning that it had likely shifted. Lawrence ordered a CT scan to confirm his suspicion that Williamson had developed a nonunion of the talonavicular joint.

Dr. Lawrence performed a second surgery on October 29, 2013, removing the existing hardware and replacing it with three screws. Lawrence also performed another bone graft, this time using bone from the upper portion of the tibia. There were no complications from the surgery, but Dr. Lawrence opined that persistent pain could be an outcome, as the risk of complications increases with each successive surgery. Williamson was required to remain non-weight bearing for a number of weeks following the surgery and Dr. Lawrence prescribed narcotics for pain management for several weeks. A December 18, 2013 treatment note indicated that Williamson had not obtained a bone stimulator as he was directed to do. Williamson testified that this was because the bone stimulator was expensive and he had no faith in its efficacy, as he had used one in the past and it had not helped. The December 18 treatment note also reported that Williamson had been bearing weight against Dr. Lawrence's advice. Dr. Lawrence cautioned Williamson that, despite good bone alignment, he did not see a lot of healing, and obtaining the bone stimulator was very important. In January, Dr. Lawrence referred Williamson to pain management, as Williamson's pain had become chronic and Lawrence felt that the continued use of narcotics was inappropriate.

Williamson did not return for another follow up with Dr. Lawrence until May 14, 2014. It appears that Williamson never obtained the bone stimulator and that he did not follow through a progressive return to weight bearing by following up regularly with Dr. Lawrence. Lawrence felt that Williamson returned in 2014 only because he had injured his left foot. At that time, Dr. Lawrence performed x-rays of both feet and found that, despite "lucency in the talonavicular fusion sight," there was no evidence of loosening or hardware failure and Williamson was not particularly concerned about any discomfort in his right foot.

With respect to his current status, Williamson testified that he is unable to participate in activities with his wife and children as he did before. He reports being unable to mow the grass or climb a ladder, and he has difficulty navigating stairs. He testified that he used to scuba dive and go to the lake, and it is difficult to be unable to participate in activities along with his family. He works out at the gym four days per week, where he uses the elliptical machine or stationary bike for thirty minutes and lifts free weights. His daily routine consists of taking the kids to school and to sports practice and doing things around the house. He reports last applying for a job in 2013. The Court also heard testimony from Williamson's wife, Monica, who cared for him after each of his surgeries. Monica testified that since his most recent surgery, Williamson's foot has improved but he still

11

has problems and cannot participate in normal activities, such as hiking or sports with his sons.

### III. CONCLUSIONS OF LAW

The liability of the United States under the Federal Torts Claim Act is to be determined in the same manner and to the same extent as a private individual under similar circumstances. 28 U.S.C. § 2674. Because the alleged negligent treatment of Williamson occurred at the Veteran's Administration Medical Center in Lexington, Kentucky, the law of Kentucky is to be applied in this case. *See* 28 U.S.C. § 1346(b). In order to establish a cause of action for medical malpractice, a plaintiff must establish, by expert testimony, (1) the standard of care recognized by the medical community as applicable to the defendant; (2) that the defendant departed from the applicable standard of care; and (3) that the defendant's departure was a proximate cause of the plaintiff's injuries. *Heavrin v. Jones*, No. 2002-CA-16-MR, 2003 WL 21673958, *1 (Ky. Ct. App. July 18, 2003) (citing *Reams v. Stutler*, 642 S.W.2d 586, 588 (Ky. 1982)). The Court will not presume negligence based on failure to cure or poor results. *Meador v. Arnold*, 94 S.W.2d 626, 631 (Ky. 1936).

A physician's general legal duty to his patient is defined as follows: "A physician has the duty to use the degree of care and skill expected of a competent practitioner of the same class and under similar circumstances." *Hyman & Armstrong, P.S.C. v.*

*Gunderson*, 279 S.W.3d 93, 113 (Ky. 2008).  While only one recovery may be had for a physician's negligence, liability may be based on one or more deviations from the accepted standard of care. *VanMeter v. Crews*, 148 S.W. 40 (Ky. 1912).

### A.    Failure to Diagnose

Williamson presented the testimony of Dr. Andrew Thomson, an orthopedic surgeon and specialist of the foot and ankle who routinely treats navicular stress fractures.  Dr. Thomson is also Assistant Professor of Orthopedics and Rehabilitation at Vanderbilt University.  Thomson had reviewed all of Williamson's records, with the exception of the x-rays taken at Fort Bragg, which were unavailable.  While Dr. Thomson was able to discern the navicular fracture based on a lateral image of the ankle from the October 26, 2009 x-ray, he conceded that the fracture easily could have been missed and the VA's failure to diagnose based on that x-ray was not a deviation from the standard of care.  Based on his review of a lateral film taken from the November 27 x-ray, Thomson opined that the fracture was visible and now displaced, "about four millimeters gapped."  Upon cross-examination, however, Dr. Thomson stated that he was not commenting upon emergency room or radiology standards of care in interpreting x-rays.  Upon reviewing the December 4, 2009 MRI, Thomson also identified the navicular fracture, pointing out displacement of three to four millimeters.

He opined that the VA's failure to diagnose the fracture, based on the December 4, 2009 MRI was a deviation from the standard of care.

Williamson also introduced the deposition testimony of Clifford Jeng, M.D., a board certified orthopedic surgeon and specialist of the foot and ankle. Dr. Jeng practices at the Institute for Foot and Ankle Reconstruction located at Mercy Medical Center in Baltimore, Maryland. He performs approximately 400 surgeries per year and around half his practice is performing corrective surgeries that have been referred from other surgeons. While Jeng testified that the fracture should not have been missed on the October 26, 2009 x-ray, that testimony is undermined by his statement that he "could certainly see how that subtle fracture line could have possibly been overlooked." He also testified that navicular fractures are commonly missed, leading to delayed diagnoses. Jeng opined that the fracture line he saw in the November 27 x-ray films, viewed in isolation, could be mistaken for arthritis. When viewed in conjunction with the October 26 film, however, Jeng felt it was a "clear case" of a fracture. Dr. Jeng went on to testify that he was able to diagnose a navicular fracture upon viewing the 2009 MRI and that the VA's failure to do so was a deviation from the standard of care.

The United States presented the testimony of Joseph Dobner, M.D., a board certified orthopedic surgeon in private practice who performs around 400 surgeries per year. Dr. Dobner was unable to

visualize a navicular fracture upon reviewing the October 2009 x-ray. Dobner explained that navicular fractures are difficult to identify and practitioners often have to "put everything together" to provide an accurate diagnosis. Upon viewing a lateral view from the November 2009 x-ray, Dobner opined that that, compared to the October x-ray, it had "progressed into more of a fracture." With respect to the December 4 MRI, Dobner testified that, "[t]here is clearly injury in [the navicular], there is no question." He opined, however, that the radiology report was not lacking and that he could not read a fracture on the MRI. Dobner discussed the inflammatory process that takes place in an injured bone and stated that, based on the MRI, the injury could have been a bone bruise.

The weight of the evidence supports a finding that the Defendants violated the appropriate standard of care by failing to diagnose Williamson's navicular fracture based on the December 4, 2010 MRI, but not before. While Williamson's two experts identified the fracture based on the earlier x-ray studies, both testified that the fracture easily could have been missed and did not characterize the VA's failure to diagnose as an unequivocal deviation from the standard of care. The Court is persuaded by the testimony of Drs. Thomson and Jeng, both specialists of the foot and ankle, who testified that failure to diagnose based on the MRI was a deviation from the standard of care. The Court is

15

also persuaded by the fact that Dr. Ahmed, a doctor of podiatric medicine was able to diagnose the navicular fracture, relying in large part on the MRI.    The testimony of Dr. Dobner is less persuasive because he is a general orthopedist, as opposed to a foot and ankle specialist.  Further, he did not review Williamson's MRI until the morning of trial and it is unclear whether he viewed every available image.

## B. Failure to Treat

Williamson's remaining claims focus on the treatment provided to him by Syed Ahmed, D.P.M.    Williamson claims that after diagnosing him with a navicular fracture on January 20, 2010, Dr. Ahmed failed to initiate an acceptable conservative treatment but, rather, advised Williamson to continue to bear some weight on his right foot.  Because this treatment violated the accepted standard of care, Williamson claims, his foot did not heal and he required surgery to repair the fracture, which Dr. Ahmed performed on April 6, 2010.  Williamson claims that the surgery also fell below the accepted standard of care and he required an additional surgery, which Ahmed performed on April 21, 2010.  Williamson claims that the second surgery also failed to meet the accepted standard of care, requiring him to seek outside medical intervention, as recounted in the Court's finding of facts.  Williamson contends that, if Dr. Ahmed's conservative approach had complied with the

accepted standard of care, i.e., non-weight bearing, his foot would have healed and he would not have required surgery.

Williamson's expert, Dr. Thomson, testified that the standard of care for treating a navicular stress fracture conservatively is making a patient non-weight-bearing in a nonremovable short leg cast for at least six weeks. According to Thomson, small case studies have shown better healing when patients are not permitted to bear any weight compared to partial weight bearing in a cast or a boot. He relied on an article published by the American Journal of Sports Medicine titled "Management of Tarsal Navicular Stress Fractures, Conservative v. Surgical Treatment." The article was a meta-analysis of studies published prior to 2009, which demonstrated, according to Thomson, that 96 percent of patients treated with the recommended conservative therapy returned to function and had pain relief. This was compared to a forty-percent success rate for patients whose treatment included weight-bearing activities. Thomson testified that he strongly emphasizes non-weight bearing in the conservative treatment of his own patients with navicular stress fractures. When asked whether Dr. Ahmed's decision to use the CAM walker was a deviation from the standard of care, Thomson responded, "I certainly would have had a patient be non-weight-bearing." Dr. Jeng also testified that the optimal treatment would be non-weight bearing with the foot in a CAM boot or cast, with the patient using crutches. Jeng testified that

17

assuming normal health and compliance, a patient following this treatment plan would most likely heal uneventfully.

Dr. Dobner did not testify as to whether Dr. Ahmed's conservative treatment approach complied with the standard of care, but he noted that at Williamson's February follow-up appointment, his foot pain was fifty-percent better, which indicates healing. Dobner testified that, based on Williamson's improvement, Ahmed's treatment plan was working and did not need to be changed. Dobner noted, through his review of Dr. Ahmed's treatment notes, that Williamson's improvement stopped and the pain became worse after he attended the military training course at Fort Bragg.

Based on all of the evidence presented, the Court is persuaded that Dr. Ahmed's treatment of partial weight bearing for Williamson's navicular fracture was a deviation from the accepted standard of care. Drs. Thomson and Jeng both testified that the accepted practice is to require patients to avoid bearing weight and Dr. Dobner did not offer testimony regarding the accepted standard of care, but simply testified that Williamson was improving despite his partial-weight-bearing status.

The Court must now consider whether the surgeries performed by Dr. Ahmed complied with the standard of care. While Dr. Ahmed characterized the first surgery as having achieved less than complete fixation of the navicular, Dr. Thomson testified that

18

there was no fixation—the screws did not cross the fracture site. Thomson attributed the poor outcome, at least in part, to the dorsal approach Dr. Ahmed used to access the fracture site. Thomson opined that the approach did not permit proper visualization of the fracture and required Ahmed to anchor the larger bone fragment into the smaller one, when the accepted practice is to anchor the smaller fragment into to the larger. Ultimately, Thomson opined that this approach was a deviation from the accepted standard of care in his performance of Williamson's surgery on April 6, 2010.

Ahmed performed a revision of the ORIF on April 21, 2010. Leaving the previously placed hardware undisturbed, he drilled in an additional, longer screw in an attempt to fixate the fracture. According to Dr. Thomson, however, Ahmed placed the screw straight down the center of the fracture line, failing to join the segments of the navicular bone. Dr. Lawrence testified that when he operated on Williamson's foot in August 2010, none of screws were crossing the fracture line, thus, they were not joining the bone segments. At trial, Thomson opined that the April 21 surgery was a deviation from the standard of care, though he previously testified during his deposition that it was not. At trial, he clarified that he did not think the April 21 was done properly but that he would "stay in line" with what he had said during his deposition and, thus, it was not a violation of the standard of

care.  Dr. Jeng opined that both surgeries were done "very poorly," but did not testify regarding the specific standard of care.

With respect to the April 6 surgery, the Court finds that there was a deviation from the accepted standard of care.  Dr. Thomson's testimony is persuasive, as he is an orthopedist, as well as a foot and ankle specialist who routinely treats navicular fractures.  His opinion is bolstered by the testimony of Dr. Jeng, also an orthopedic surgeon, specializing in the foot and ankle, who believed that both surgeries were performed very poorly.  The Court also gives weight to the testimony of Dr. Lawrence, a foot and ankle specialist, who operated on Williamson's foot and found that none of the hardware in place actually crossed the fracture site.  While a poor result is not conclusive of negligence, it is some evidence under these circumstances.  As Williamson has not provided expert testimony stating that the April 21 surgery was a deviation from the standard of care, the Court concludes that it was not.

IV.  CAUSATION

Under Kentucky law, plaintiffs have the duty of proving, through expert testimony, that their physician's negligence is the proximate cause of their injury and damages.  *Andrew v. Begley*, 203 S.W.3d 165, 170 (Ky. Ct. App. 2006).  The opinion of the expert must be based "on a reasonable medical probability."  *Id.*  Dr. Thomson testified that the VA's failure to diagnose the fracture

was a substantial factor in Williamson's ultimate outcome and in his need for surgery. The American Journal of Sports Medicine article upon which Thomson relied, however, reported that the timing with which non-weight-bearing treatment was initiated did not have a significant effect on patient outcome, suggesting that a one-month lapse in diagnosis would not be crucial. Thomson went on to opine that the VA's failure to diagnose the fracture, combined with Dr. Ahmed's conservative treatment, were substantial factors contributing to the poor condition of Williamson's foot just prior to his surgery on April 6. Following the April 6 surgery, Thomson would not have expected the bone to heal without further surgical intervention. With respect to Williamson's eventual talonavicular fusion and revision thereof, Thomson testified, "if you get the fracture to heal, then you typically don't develop the arthritis that would lead to an early fusion like that." Dr. Jeng testified that if the fracture had been diagnosed properly and the correct non-weight-bearing treatment had been provided, the fracture most likely would have healed uneventfully, assuming Williamson was otherwise healthy and compliant.

Williamson's compliance during his medical treatment has been questioned and the Court is persuaded that it was less than ideal. The fact that he participated in a two-week military course, which included a land navigation exercise in February through March 2010

21

speaks volumes.  While Williamson contends that Dr. Jeng approved the exercise, the Court finds it unlikely, as it is not reflected in the treatment notes, and Williamson was supposed to be using a CAM walker during that time.  Prior to Williamson participating in this activity, his foot pain had been improved by fifty-percent, but when he returned from Fort Bragg, the pain was so intense he was ready to undergo surgery.  After the April 6 surgery, Dr. Ahmed's treatment plan involved a gradual return to full weight-bearing.  By July 12, Williamson had already attempted a running test for the National Guard, which caused his foot pain to increase.  During his treatment with Dr. Lawrence, Williamson had some compliance issues, as well.  Williamson made another attempt to complete a running test for the National Guard several months after his first surgery with Dr. Lawrence.  Lawrence testified that he would not have recommended it at the time because Williamson was still having pain with just walking.  Following Williamson's second surgery by Lawrence, Williamson failed to obtain a bone stimulator and began bearing weight against Dr. Lawrence's advice.  In addition, he stopped attending his appointments.

While the Court finds that the standard of care was violated when Williamson's navicular fracture was not diagnosed during the period of December 4, 2009 to January 20, 2010, the Court finds that the damage as a result of this delay is limited.  In concluding

22

so the Court relies on the fact that this was a relatively brief period and Dr. Thomson's testimony that the onset of conservative treatment is not statistically significant with respect to outcome.   The Court is persuaded that had Dr. Ahmed initiated a conservative treatment in keeping with the standard of care, there is a greater chance that Williamson's foot would have healed uneventfully.   As a result of Dr. Ahmed's failure to implement non-weight-bearing treatment, along with Williamson's own overuse of his foot during a land navigation training course, he required surgery.   Unfortunately, the surgery did not comply with the standard of care and Williamson suffered further complications. Under Kentucky law, however, a plaintiff is required to mitigate his damages.   *Morgan v. Scott*, 291 S.W.3d 622, 640 (Ky. 2009). This includes complying with one's doctor's instructions. *See id.* Because the Court believes that Williamson's healing was limited by failure to use the bone stimulator and, particularly, by his repeated attempts to bear too much weight and run prematurely, his damages will be reduced accordingly.

## V.    DAMAGES

The Court finds that Williamson is entitled to recover $108,529.64 in medical expenses incurred in connection to his treatment provided by Dr. Lawrence at the University of Kentucky Medical Center.

With respect to lost wages due to time off work, Williamson is entitled to an award of $129,405.91. The Court declines Plaintiff's request to reconsider its Order of June 15, 2015. Plaintiff's FECA compensation, regardless of *when* Plaintiff received it, was paid because of Plaintiff's right navicular fracture. For the reasons stated in the Court's Order of June 2015, FECA compensation must be offset against any damages awarded herein.

With respect to pain and suffering, the Court finds that $120,000 is a reasonable sum to compensate Williamson. By January 2011, he was once again bearing full weight on his right foot and, around that time, he attempted a PT test for the National Guard. Accordingly, the Court's award for past pain and suffering corresponds roughly with a period of one year. With respect to future pain and suffering, the Court awards $0.00. While the Court is mindful that Williamson may still have some problems with his foot, they do not rise a level that merits compensation for pain and suffering. While Williamson may have some discomfort and problems navigating uneven surfaces, he goes to the gym four days per week and uses an elliptical trainer, which requires great exertion of the foot and ankle. Further, he is able to transport his children to school and extra-curricular activities. Based on the evidence presented, his quality of life and prospects for the future appear to be good.

24

These values are subject to an offset in the amount of $133,601.16 for the reasons discussed in the Court's Order of June 15, 2015, for a total award of $224,334.39.

For the foregoing reasons,

**IT IS HEREBY ORDERED** that **JUDGMENT** be entered in favor of Plaintiff Gary Williamson and against Defendant United States of America and that damages be awarded to Mr. Williamson in the amount of $224,334.39, plus interest from the date of judgment. A separate judgment will be entered contemporaneously herewith.

This the 21st day of April, 2016.

Signed By:

_Joseph M. Hood_

Senior U.S. District Judge